**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| Todd L. Anderson, | Case No. 20-cv-04794 |
| Plaintiff, | Judge John Robert Blakey |
| v. | **JURY TRIAL DEMANDED** |
| Rush Street Gaming, LLC, Rush Street Interactive LLC, Rush Street Interactive, LP, Neil Bluhm, and Greg Carlin, | |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff Todd L. Anderson ("Anderson"), for his Complaint against Defendants Rush Street Gaming, LLC ("Rush Street"), Rush Street Interactive LLC, Rush Street Interactive, LP,[1] Neil G. Bluhm ("Bluhm"), and Greg Carlin ("Carlin") (collectively, "Rush Street Defendants") states and alleges as follows:

**INTRODUCTION**

1.     According to its website, Rush Street is "one of the fastest-growing gaming companies in North America, launching four casinos in four years." According to a document on the U.S. Securities and Exchange Commission's ("SEC") website, Rush Street Interactive "is a market leader in online casino and sports betting in the United States." Bluhm and Carlin are owners and officers of both entities. Collectively, the Rush Street Defendants' business comprises "several full-service casinos, internet gaming, myriad of restaurants, multiple hotels, television production and more."

---

[1]     On information and belief, Rush Street Interactive LLC may have been converted to Rush Street Interactive, LP, but Anderson does not at this time have sufficient information to confirm. These entities are, therefore, together referred to as "Rush Street Interactive" or "RSI."

2.  Anderson and the Rush Street Defendants became business partners eight years ago.  During a career transition, Anderson took a chance and agreed to partner up with Bluhm, Carlin, a newly formed entity, Rush Street Interactive LLC, and the well-established Rush Street to create a new gaming-related business, specifically, a Rush Street subsidiary based on televised poker, which the Rush Street Defendants had previously lacked but needed.  Anderson currently serves as the President of that subsidiary, which is called Rush Street Productions, LLC ("Rush Street Productions").

3.  Crucial to Anderson's decision to take that chance was the Rush Street Defendants' promise that Anderson would acquire a 1% equity interest in Rush Street Interactive LLC, a complementary and recently formed Rush Street subsidiary.  This is a promise that Anderson has recently learned the Rush Street Defendants do not intend to honor, shortly before an initial public offering related to Rush Street Interactive's business, valued at $1.78 billion dollars.  Recently— on the eve of that public offering—Anderson learned that the Rush Street Defendants had purportedly transferred Rush Street Interactive LLC's equity, but apparently not Anderson's, to a new entity, Rush Street Interactive, LP.

4.  Although Anderson fulfilled his end of the bargain, and although Anderson contributed vitally to the Rush Street Defendants' success through the televised platform for which he was responsible, the Rush Street Defendants have declared that they do not intend to honor their promise.  Rush Street Interactive's successes make the Rush Street Defendants' promise to Anderson no less real and enforceable.  Through this lawsuit, Anderson seeks to enforce his rights.

## THE PARTIES

5. Anderson is an individual who currently resides in Pelican Rapids, Minnesota, and is a Minnesota citizen.

6. Rush Street is a Delaware limited liability company with its principal place of business in Chicago, Illinois. On information and belief, each member of Rush Street is a citizen of a state other than Minnesota.

7. Rush Street Interactive LLC is a Delaware company with its principal place of business in Chicago, Illinois. On information and belief, each member of Rush Street Interactive LLC recognized by Defendants is a citizen of a state other than Minnesota.

8. On information and belief, on or around January 1, 2019, Rush Street Interactive LLC may have been converted into Rush Street Interactive, LP.

9. If this conversion took place, Delaware law deems Rush Street Interactive, LP to be the same entity as Rush Street Interactive LLC because the conversion constitutes a continuance of the LLC's existence in the new business form.

10. Rush Street Interactive, LP is a Delaware company with its principal place of business in Chicago, Illinois. On information and belief, each member of Rush Street Interactive, LP recognized by Rush Street is a citizen of a state other than Minnesota.

11. Bluhm is the co-founder and Chairman of both Rush Street and Rush Street Interactive. On information and belief, he is a citizen of the state of Illinois.

12. Carlin is the co-founder and Chief Executive Officer of both Rush Street and Rush Street Interactive. On information and belief, he is a citizen of the state of Illinois.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties, and the amount in controversy exceeds the jurisdictional threshold of $75,000.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because this is a judicial district in which, on information and belief, at least one defendant resides.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to Anderson's claims occurred.

## FACTUAL BACKGROUND

### *Todd Anderson*

15.     Anderson was born, raised, and has spent his life working in the upper Midwest.

16.     Born in the central Minnesota city of Alexandria, Anderson spent most of his childhood in St. Paul, Minnesota.

17.     After graduating from high school, Anderson returned to greater Minnesota and attended Concordia College.  Concordia College is in Moorhead, Minnesota, just across the river from Fargo, North Dakota.

18.     Soon after graduating from Concordia College, Anderson began working in media. His first media job was with KQWB radio in Fargo, North Dakota.

19.     After 18 months with KQWB, Anderson joined Red River Broadcasting and started working in the television industry.  Anderson was quickly promoted to General Sales Manager of Red River Broadcasting.  There, for over a decade, he helped grow the company from a small network with one station to a $40+ million company with three different stations.

20.     Anderson developed invaluable contacts in the regional television broadcasting industry during his tenure at Red River Broadcasting, and he gained equally invaluable knowledge and experience in televised programming generally.

### *Anderson builds Heartland Poker Tour*

21.     In the late 1990s, Anderson starting player poker for fun.

22.     This was shortly before what came to be known as the "poker boom," when poker significantly increased in popularity.

23.     In 2003, the World Poker Tour launched its inaugural season on cable television. Interest in playing and watching poker on television continued to grow immensely.

24.     Anderson watched televised poker, including the World Poker Tour, and came to realize that there was not a televised poker tour featuring non-professional players and with a smaller buy-in.

25.     Ready for his next adventure and interested in building a national televised platform as an owner from the ground up, Anderson left Red River Broadcasting in 2005. He worked with a partner to form All In Production, LLP ("All In Production").

26.     Together, through All In Production, he and his partner conceived of, launched, and successfully built the Heartland Poker Tour.

27.     Heartland Poker Tour was a grassroots televised poker tour.

28.     Heartland Poker Tour's customer base was primarily non-professional poker enthusiasts, like Anderson himself, who worked other jobs during the week and then came to a casino and played the tour's events on a weekend.

29.     Anderson and his business partner co-owned All In Production equally.

30.     Anderson eventually became the President of All In Production.  As President, Anderson was in charge of television distribution, revenue, and sponsorship.

31.     Anderson and his business partner travelled the country putting on the tour's poker tournaments and events and filming the final poker table.

32.     Heartland Poker Tour became one of the premier poker tours in the country, holding events from coast to coast each year.  To this day, its poker tournaments are recorded and broadcast on many television stations.

33.     The tour has awarded more than $100 million in Main Event prize pool money to poker players far and wide.

### Anderson Sells Heartland Poker Tour

34.     After over five years of successfully building Heartland Poker Tour, Anderson and his business partner were approached by a buyer—Federated Sports + Gaming, Inc. ("Federated Sports + Gaming").

35.     Federated Sports + Gaming had been formed in 2010 by Jeffrey Pollack, the former director of the World Series of Poker.  It launched the Epic Poker League, an exclusive tournament series, televised domestically and internationally.

36.     Anderson and his business partner agreed to sell Heartland Poker Tour to Federated Sports + Gaming.

37.     Through an asset purchase agreement dated April 28, 2011, All In Production sold Heartland Poker Tour and its related assets to Federated Sports + Gaming.  In the cash and stock deal, Federated Sports + Gaming offered $4.3 million in addition to tens of thousands of Federated Sports + Gaming's shares.

38.     Federated Sports + Gaming formed a wholly owned subsidiary, Federated Heartland, Inc. ("Federated Heartland"), to operate Heartland Poker Tour.

39.     Anderson and his business partner continued to run Heartland Poker Tour's day-to-day operations.   Meanwhile, Anderson started thinking about what might come next in his professional and entrepreneurial endeavors.

### Rush Street

40.     Anderson soon encountered two highly successful professionals in the gaming industry—Bluhm and Carlin.

41.     After a brief stint as a practicing attorney, Bluhm had launched his career as a real-estate and private-equity investor.

42.     In the late 1980s, Carlin—an investment banker—had begun working with Bluhm's private-investment firm.  Bluhm and Carlin had worked closely to develop and operate a casino in Canada.

43.     After their experience working together, Bluhm and Carlin formalized their business partnership and co-founded Rush Street.  According to its website, Rush Street is one of the fastest growing companies in the gaming industry.

44.     Bluhm became and remains Rush Street's Chairman and Carlin became and remains Rush Street's Chief Executive Officer.

45.     Rush Street originally operated brick-and-mortar casinos.

### Rush Street seeks to expand into online and televised poker

46.     In 2012, Bluhm and Carlin decided to expand Rush Street's web- and television-based presence and enhance its brand.

47.     Bluhm and Carlin teamed up with Richard Schwartz ("Schwartz") to launch a new Rush Street subsidiary—Rush Street Interactive.

48.     Schwartz had previously worked for WMS Gaming, where he had helped build its European online gaming business.

49. On March 5, 2012, Rush Street Interactive LLC's official certificate of formation was filed with the Delaware Secretary of State.

50. Through Rush Street Interactive, Bluhm and Carlin sought to develop an internet gaming platform under Rush Street's brand.

51. Schwartz became Rush Street Interactive's President.

52. Schwartz reported directly to Carlin who, in turn, reported to Bluhm.

53. The Rush Street Defendants wished to grow their gaming business by, among other things, venturing into televised poker.

54. One of Schwartz's first major acts as Rush Street Interactive's President was to help acquire or develop a televised-poker brand for Rush Street, Carlin, and Bluhm.

55. Rush Street, Carlin, and Bluhm, wanted a televised-poker brand to support and grow Rush Street and Rush Street Interactive's anticipated new online poker business.

### Federated Sports + Gaming declares bankruptcy

56. In late 2011, Federated Sports + Gaming failed to pay All In Production the $4.3 million it owed under the asset purchase agreement.

57. Then, to make matters worse, in February 2012, Federated Sports + Gaming and Federal Heartland filed for chapter 11 bankruptcy.

58. During Federated Sports + Gaming's bankruptcy process, several companies showed interest in acquiring the Heartland Poker Tour asset.

### Rush Street approaches Anderson about acquiring Heartland Poker Tour

59. One of the companies interested in Heartland Poker Tour was Rush Street.

60. The main investor in Federated Sports + Gaming, J.B. Pritzker, connected Rush Street with Anderson.

61.     Pritzker sent an email to Anderson, introducing him to Rush Street and copying Schwartz. Pritzker wrote that Schwartz was "working with a group here in Chicago called Rush Street that would like to engage with [Anderson] regarding Heartland and its future."

62.     In response to Pritzker's email, Schwartz wrote on May 4, 2012 that

> My colleagues and I are big fans of the Heartland Poker Tour and are impressed by the business that you and your partner . . . have built, especially the perseverance required to run over 100 tour events and counting. Our President used to be the General Manager at the Rio so he knows what it takes to run poker tour events and it's hard work!
>
> Frankly, after evaluating the Federated business, we felt (and shared with David Goldberg a few weeks ago) that the HPT [Heartland Poker Tour] was the only part of "that" business that really interested and excited us! In fact, we think that we have the potential to add a tremendous amount of value to help grow the HPT. I'm writing directly to you to ask if you are available early next week to have a phone call so I can educate you more about our company and the reasons why I feel this could be a strong match (at least from our perspective). In fact, if you're planning to make a bid of your own for the HPT assets, we'd be interested in talking to you about ways that we may be able to participate and/or help to make it a successful bid.

63.     In the same email, Schwartz overviewed Rush Street:

> As a brief introduction, Rush Street Gaming is a successful (generates over $1 billion revenues per year) and progressive thinking land-based casino group based in the Midwest . . . Chicago to be precise. The group, owned by a well-respected real estate investor named Neil Bluhm, has traditionally kept a very low profile (no corporate website . . . yet), but this is changing as we gain national exposure based on the success of our land-based casino properties and as we prepare to enter the legalized online poker market in the US.

64.     Schwartz also told Anderson that the Rush Street group's "integrity, reputation, [and] entrepreneurial spirit" were what attracted Schwartz to join Rush Street.

65.     Schwartz, Anderson, and others had a follow-up phone conversation about Heartland Poker Tour.

9

66.     On June 3, 2012, Schwartz sent Anderson and others involved in Heartland Poker Tour another email.  Schwartz wrote:

> Since we spoke in early May, Rush Street Gaming has continued to progress our online and land-based gaming convergence strategies.
>
> We continue to feel that the HPT would fit very nicely with our plans, but also, that we could add a great deal of value to further grow the business.

67.     Despite Rush Street's overtures, Anderson declined to partner with Rush Street while he was working for Federated Sports + Gaming and running the Heartland Poker Tour.

### *Rush Street unsuccessfully bids to acquire Heartland Poker Tour*

68.     The bankruptcy court ultimately approved a bidding procedure for Federated Sports + Gaming's assets.

69.     On June 13, 2012, there was an auction for substantially all of Federated Sports + Gaming's assets.

70.     Four companies bid on the Heartland Poker Tour asset:  All In Production; a subsidiary of Pinnacle Entertainment, Inc. ("Pinnacle"); William Hill plc ("William Hill"); and Rush Street.

71.     Schwartz represented Rush Street at the auction and bid on Rush Street's behalf.

72.     Rush Street bid $4 million to acquire Heartland Poker Tour.

73.     But Pinnacle outbid Rush Street and the other auction participants.  Pinnacle offered to pay $300,000 to acquire Federated Sports + Gaming and $4.3 million to acquire Federated Heartland.

74.     Pinnacle ultimately acquired Heartland Poker Tour.

75.     On July 6, 2012, about one month after Pinnacle won the auction and in light of the new company ownership, Anderson decided to resign as President of Heartland Poker Tour.  He decided that he wanted to build a new business.

*Rush Street approaches Anderson again*

76.     The Rush Street Defendants decided to form a new entity, eventually called Rush Street Productions, for their venture into televised poker.

77.     The Rush Street Defendants identified Anderson as a good candidate to run Rush Street Productions.

78.     A number of people whom Anderson greatly trusted—including J.B. Pritzker and another highly successful entrepreneur, the latter of whom acted as a consultant to Anderson in the sale of Heartland Poker Tour—recommended that Anderson connect with the Rush Street Defendants.

79.     Pritzker and that same successful entrepreneur had similarly recommended Anderson to Rush Street.  The Rush Street Defendants decided that Anderson would be a good partner with whom to team to launch a new venture into televised poker.

80.     On July 9, 2012, just months after Rush Street Interactive was formed and after some emails back-and-forth, Anderson received a call from Richard Schwartz for the Rush Street Defendants.

81.     Schwartz made it clear to Anderson that he had recently started working with Bluhm and Carlin, and that he was a junior executive in the Rush Street organization.

82.     Schwartz also made it clear that all decisions would be coming from and made by Bluhm and Carlin.

83.     Anderson and Schwartz discussed Anderson's ideas for televised poker.

84.     Schwartz shared his enthusiasm for and trust in his new business partners, Bluhm and Carlin.  Schwartz explained that his trust in Bluhm and Carlin was essential to his decision to join Rush Street.

85.     Schwartz concluded the call by saying that he wanted to discuss their conversation with Carlin and possibly set up a meeting in Chicago.

### The Rush Street Defendants invite Anderson to Chicago

86.     On July 11, 2012, Schwartz emailed Anderson, inviting him to Chicago to meet with Bluhm, Carlin, Schwartz, and another Rush Street officer.

87.     Anderson traveled to Chicago and, on July 16, 2012, met with Carlin, Schwartz, and another Rush Street officer at Rush Street's headquarters.

88.     Because of a last-minute conflict, Bluhm was not able to join the meeting.  On information and belief, Carlin, Schwartz, and the other Rush Street officer met with Anderson on their own behalf as well as on behalf of Rush Street, Rush Street Interactive, and Bluhm.

89.     At the meeting, Anderson shared his vision for what would become a new televised poker tour and show—Poker Night in America.

90.     Carlin and Schwartz expressed that they liked Anderson's idea for Poker Night in America.

91.     Schwartz said that he had seen how powerful televised poker was for building an online gaming business when he worked for WMS Gaming to build its European online gaming business.

92.     Schwartz stated that he knew from his experience in Europe that having branding incorporated into a television show is more powerful marketing than running ads alone.

93.     Schwartz also stated that he knew from his experience in Europe that a successful televised-poker show could very effectively activate online gaming customers.

94.     Carlin said that he was interested in not only activating online-gaming customers the way that Schwartz envisioned, but also promoting Rush Street's existing land-based casinos.

95.     In short, the Rush Street Defendants shared that they saw and liked the show's potential ability to bring visibility to and help drive traffic and revenue to Rush Street's existing land-based and soon-to-be online casinos.

96.     Schwartz asked Anderson what it would take for Anderson to join the Rush Street Defendants and to form a joint venture.

97.     Anderson responded by explaining his important requirement to have an invested and entrepreneurial role in Rush Street's business.  This requirement included Rush Street Interactive, which the parties anticipated would be the immediate parent company of, and closely related to, the television poker business.

98.     Anderson was asked to provide a write-up of his show idea.  He did so the following week.

99.     Anderson left the meeting impressed by Rush Street's team.  To Anderson, they seemed smart, trustworthy, and hardworking.

### The Rush Street Defendants decide to move forward with Anderson

100.     Two days after they met, on July 18, 2012, Schwartz emailed Anderson, stating that both he and Carlin "were impressed with your passion, experience, and expertise," and "feel we could build a dominant poker business."

101.     Schwartz previewed that a term sheet from Rush Street would be coming:

> [W]e're currently working on a term sheet proposal for you.  As discussed Monday, I've been targeting to get you something by the end of this week, though I'm concerned that the equity component will require more active involvement from Neil [Bluhm] than usual, which could push us into next week.

102.     On information and belief, Schwartz spoke for Rush Street Interactive, in addition to both Bluhm and Carlin.

103.    On information and belief, Schwartz would not and could not have offered Anderson an equity interest in a Rush Street subsidiary without both Bluhm's and Carlin's authorization and direction to do so.

104.    Schwartz also told Anderson that Rush Street liked Anderson's "straight-shooter approach since that's our style too."

### *The Term Sheet*

105.    To attract Anderson to join Rush Street and become the president of what became Rush Street Productions, the Rush Street Defendants offered Anderson a compensation package including several components.

106.    These components were first presented in written form for Anderson in a term sheet (the "Term Sheet," attached as Exhibit A).

107.    On July 25, 2012, Schwartz provided Anderson with the Term Sheet. Schwartz's cover email read: "I'm please[d] to share with you a term sheet we put together for the new poker business we hope to create together."

108.    On information and belief, the "we" that Schwartz referred to included Bluhm and Carlin. Schwartz could not have offered Anderson equity interest in any Rush Street affiliated business without both Carlin's and Bluhm's authorization and direction to do so. Schwartz also could not have offered any employment terms without Carlin's approval.

109.    The Term Sheet provided that Rush Street Interactive "would like to submit the following non-binding proposal to form a new joint venture entity" and included the following terms:

      a.  Rush Street Interactive would invest in the joint-venture entity;

      b.  Rush Street Interactive would own 51% of the common equity of the joint-venture entity;

14

    c.    Anderson would own 33% of the common equity of the joint-venture entity;

    d.    Anderson would receive a base salary of $200,000;

    e.    Anderson would receive "1% of the common equity in RSI, vesting over 4 years subject to accelerated vesting in the case of a liquidity event or change of control."

110.    On July 25, 2012, the same day that Anderson received the Term Sheet, Anderson and Schwartz spoke by phone. Anderson asked Schwartz questions about among other things payroll, accounting, timeline, and the Rush Street and Rush Street Interactive corporate structure.

111.    Schwartz said that he would discuss Anderson's questions with Carlin.

112.    On July 26, 2012, Schwartz emailed Anderson and told him that he had "caught up with Greg [Carlin and another Rush Street officer] earlier this afternoon about our conversation yesterday, including some of your great questions." Schwartz provided a response to some of Anderson's questions.

### Anderson's Counteroffer

113.    Anderson responded with a counteroffer on July 27, 2012 ("Counteroffer," attached as Exhibit B).

114.    Anderson accepted most terms in the Term Sheet, but he specifically countered for a higher investment by Rush Street Interactive in the new joint venture and a 3% equity interest in Rush Street Interactive, vesting over three years and subject to acceleration.

115.    In his cover email with the counteroffer, Anderson stated that "[t]he interactive business"—*i.e.*, the equity interest in Rush Street Interactive—"is the key."

116.    And that equity interest was indeed fundamental to Anderson's consideration of a joint venture with the Rush Street Defendants. After his experiences at Red River Broadcasting and Heartland Poker Tour, Anderson insisted on being a part of something larger than television

alone.  He wanted to have a meaningful ownership stake in a business with significant growth potential.

### Anderson decides to accept the 1% equity interest

117.    After sending the counteroffer, Anderson spoke further with a Rush Street officer, who encouraged Anderson to accept the 1% interest originally offered in the Term Sheet.

118.    Anderson learned that even Schwartz had only a 5% equity interest in Rush Street Interactive, and that the Rush Street officer to whom Anderson was speaking had only a 1% equity interest in Rush Street Interactive.

119.    In light of these other equity interests, Anderson decided to accept the 1% equity interest that the Rush Street Defendants had offered.

### The Agreement

120.    In late July, Anderson contacted Schwartz by phone and the two reached an oral agreement regarding Anderson's employment and Anderson and Rush Street's joint venture ("the Agreement").

121.    Schwartz had actual, apparent, and implied authority to enter into the Agreement on behalf of the Rush Street Defendants.

122.    On information and belief, Schwartz was authorized by the Rush Street Defendants to enter into the Agreement on behalf of Rush Street and Rush Street Interactive, and he spoke for the Rush Street Defendants (as he had during the negotiations).

123.    Schwartz had apparent authority to enter the Agreement because the Rush Street Defendants held Schwartz out as their main negotiator with Anderson—including during the auction that was part of Federated Sports + Gaming's bankruptcy.  Anderson justifiably believed and relied on Schwartz and the Rush Street Defendants' representations that Schwartz could negotiate on behalf of the Rush Street Defendants.

124. Reaching the Agreement was also within Schwartz's implied authority as President of Rush Street Interactive, given the anticipated interdependent relationship between the new Rush Street televised-poker business and Rush Street Interactive's online-gaming business.

125. In the Agreement, Anderson and the Rush Street Defendants agreed to the terms in Anderson's Counteroffer with two changes:

  a. Rush Street Interactive would invest $1.25 million in the new Rush Street entity, a mid-point between the Term Sheet and the Counteroffer;

  b. Anderson would have a 1% equity interest in Rush Street Interactive, vesting over 4 years subject to accelerated vesting in the case of a liquidity event or change of control.

126. Under the Agreement, the Rush Street Defendants agreed to work with Anderson and combine their collective knowledge, skill, and experience, to form a new Rush Street entity, for a joint venture into televised poker.

127. The new Rush Street entity was intertwined with Rush Street Interactive, and together, the two newest Rush Street entities would help further build the Rush Street brand. This would, in turn, drive revenue for Rush Street's anticipated online gaming platform as well as its land-based casinos.

128. Together, Anderson and the Rush Street Defendants agreed that Anderson would be in charge of the new Rush Street entity. Specifically, he would be responsible for developing and launching a new poker tour—Poker Night in America. He would have significant autonomy in that role.

129. In other words, through the Agreement, Anderson and the Rush Street Defendants agreed to all the material terms for their joint venture and Anderson's employment: Anderson's compensation and benefits, the Rush Street Defendants' capitalization of the new entity,

Anderson's and the Rush Street Defendants' respective equity interests in the new Rush Street entity, and Anderson's equity interest in Rush Street Interactive.

### *The 1% equity interest was material*

130.    A material component of the Agreement was Anderson's 1% equity stake in Rush Street Interactive.

131.    As reflected in the Term Sheet, the 1% equity interest was to vest in four equal parts over four years, although it could vest fully and immediately if Rush Street Interactive had a change in control or if other specific events occurred.  In other words, the 1% equity interest could vest in its entirety within months if, for example, a change in control occurred shortly after the joint venture commenced.

132.    The 1% equity interest was very important and indeed essential to Anderson, who would not have agreed to join the Rush Street Defendants and create a joint venture if the equity interest had not been a term.

133.    The Rush Street Defendants knew that the 1% equity term was important to Anderson.  Indeed, Anderson had explicitly told the Rush Street Defendants through Schwartz that the equity interest was "the key" to the Rush Street Defendants and Anderson reaching an agreement.

### *Carlin ratifies the Agreement*

134.    After Anderson and the Rush Street Defendants entered into the Agreement, welcome emails started to flow in.

135.    On July 31, 2012, a Rush Street officer wrote in an email to Anderson:  "I heard the great news from Richard.  Congratulations and welcome.  We are all very excited to have [you] joining us."

136.    Carlin also sent Anderson a congratulatory email.  On August 2, 2012, Carlin wrote:

todd-

i was very happy to hear that you are teaming up with rush street to launch your next venture. we are excited to work with you to create a fun and successful venture. feel free to reach out anytime.

137. In other words, multiple Rush Street officers, including Carlin, expressed their approval and ratification of the Agreement.

### *Anderson declined other opportunities to take a chance on Rush Street*

138. Anderson had other options when he joined the Rush Street Defendants.

139. Pinnacle, which won the bid for Heartland Poker Tour, offered to retain Anderson and his partner as co-managers of Heartland Poker Tour.

140. William Hill offered to invest $6 million dollars in Anderson's vision for Poker Night in America.

141. Anderson also considered self-funding Poker Night in America and operating the production company in North Dakota, in which case he would have had 100% of the company's equity.

142. Anderson decided to turn down these lucrative opportunities and join the Rush Street Defendants.

143. Anderson made that choice in part because Bluhm, Carlin, and Schwartz seemed like some of the smartest professionals he had crossed paths with, and because Bluhm and Carlin came so highly recommended by multiple people close to them and trusted by Anderson.

144. Anderson trusted and liked the Rush Street Defendants. They presented themselves like the perfect partners for his next business venture—the launch of Rush Street Productions and its symbiotic and interrelated relationship with its anticipated immediate-parent company, Rush Street Interactive.

*Memorializing the Agreement*

145.     After the parties entered into the Agreement, Schwartz told Anderson that the Rush Street Defendants would work toward preparing additional documentation memorializing their Agreement.

146.     On August 5, 2012, Schwartz sent Anderson an email inviting him to Chicago for a second visit to meet Bluhm in person and to have a "brainstorm/discussion" with Bluhm, Carlin, and others about the new Rush Street business.

147.     Around the same time, Schwartz also told Anderson that a further formal contract memorializing the Agreement's terms would be coming.

148.     On August 8, 2012, Anderson received that formal document ("the Agreement Letter," attached as Exhibit C).

149.     Speaking for the Rush Street Defendants (as he had during the negotiations), Schwartz sent the Agreement Letter to Anderson by email.  Schwartz's type-written name was subscribed at the end of the email and Agreement Letter.

150.     Among other terms, consistent with the Term Sheet, Counteroffer, and the Agreement, the Agreement Letter provided that:

> a.  Anderson would be employed as the president of a new Rush Street and Rush Street Interactive subsidiary, Rush Street Productions;
>
> b.  Anderson's employment would start on an agreed-upon date;
>
> c.  Rush Street Interactive would invest $1.25 million to fund Rush Street Productions' growth;
>
> d.  Anderson would own 33% of Rush Street Productions' common equity;
>
> e.  Anderson would own a 1% equity interest in Rush Street Interactive, which would vest in four equal installments of 0.25% beginning on the one-year

anniversary of Anderson's start date and, assuming Anderson's continued employment, on each anniversary thereafter;

f. The vesting schedule for that 1% equity interest would accelerate so that Anderson's 1% equity interest would immediately and fully vest if Rush Street Interactive went through a liquidity event or a change of control.

151. The Agreement Letter also provided that Anderson's equity interest would "be subject to the further terms and conditions to be set forth" in the Rush Street Interactive and Rush Street Productions operating agreements, which Anderson was told had not yet been prepared.

### Anderson and the Rush Street Defendants move forward with their business

152. The day after receiving the Agreement Letter, Anderson met with Bluhm, Carlin, Schwartz, and another Rush Street officer in Chicago.

153. The group strategized about their new televised poker business.

154. Around the same time, Anderson retained an attorney for the formality of reviewing the Agreement Letter.

155. On August 13, 2012, Anderson informed Schwartz that he would need to see the operating agreements for Rush Street Interactive and Rush Street Productions before Anderson could execute the Agreement Letter. This was because a part of the Agreement Letter incorporated by reference those yet-to-be drafted operating agreements.

156. At no point did Anderson or anyone else suggest that there would be further discussion of the Agreement's material, agreed-upon terms, including Anderson's salary and equity interests in Rush Street Productions and Rush Street Interactive.

157. On August 15, 2012, Anderson spoke with Schwartz about the anticipated operating agreements.

158.     On August 16, 2012, Anderson sent Schwartz a follow-up email, thanking Schwartz for their discussion about the operating agreements.  Anderson explained that he was concerned about just a few things in the operating agreements, "including possible dilution" and "tax implications."

159.     Anderson copied his attorney on the email and said that, consistent with Schwartz's suggestion, Anderson's attorney would be willing to speak with the Rush Street Defendants' in-house attorney to discuss the anticipated operating agreements.

160.     After some back and forth about the operating agreements and Rush Street's continued delay in drafting the operating agreements, Schwartz told Anderson that a new letter memorializing Anderson and the Rush Street Defendants' Agreement would be coming.

161.     Because the Rush Street Defendants had agreed to all material terms of Anderson's employment and their joint venture, and because Anderson trusted the Rush Street Defendants, Anderson started work with the Rush Street Defendants without waiting for the operating agreement to be finalized and prepared, or for a revised agreement letter to be drafted.

162.     On or around August 21, 2012, after speaking to Carlin and Schwartz, Anderson officially started working with the Rush Street Defendants at his $200,000 annual salary.

163.     Anderson, relying on all the terms of the Agreement, including the 1%-equity term, became the President of Rush Street Productions.

164.     Rush Street paid Anderson's salary and furnished his benefits.  On information and belief, Rush Street did so because that was logistically easier until Rush Street Interactive's and Rush Street Production's operating agreements were prepared.

*Anderson trusted and placed his confidence in*
*the Rush Street Defendants, especially Bluhm and Carlin*

165.     Anderson placed trust and confidence in the people with whom he was creating a new joint venture.  They had superior knowledge and experience with the various Rush Street entities and their interlocking business efforts and plans.

166.     For example, Bluhm is a co-founder of both Rush Street and Rush Street Interactive and the Chairman of both Rush Street and Rush Street Interactive.

167.     Similarly, Carlin is a co-founder of both Rush Street and Rush Street Interactive and the Chief Executive Officer of both Rush Street and Rush Street Interactive.

168.     Together, Bluhm and Carlin maintained controlling interests in and ultimately made all significant business decisions for the various Rush Street entities.

169.     In contrast, Anderson's experience was limited to televised poker, and his management role in the Rush Street entities was limited.

170.     Moreover, one or more of the Rush Street Defendants had the controlling equity interest in Rush Street Productions.

171.     And one or more of the Rush Street Defendants also had the controlling equity interest in Rush Street Interactive.

172.     According to a document available on the SEC's website, Bluhm and Carlin are "RSI's majority shareholders."

173.     In contrast, Anderson had a minority (1%) equity interest in Rush Street Interactive.

174.     Anderson was reasonably justified in placing his trust and confidence in Bluhm, Carlin, and the other Rush Street Defendants.

175.     Together, Anderson and the Rush Street Defendants had committed to working together to expand Rush Street's reach, brand, and financial success through Rush Street Productions and Rush Street Interactive.

176.    Bluhm and Carlin came highly recommended to Anderson by influential and trustworthy people.

177.    Bluhm and Carlin worked in a highly regulated environment, in which licensees and their officers are investigated thoroughly for honesty and integrity and closely scrutinized by regulators.

178.    And on top of all this, Rush Street's other officers and their subordinates, including Schwartz, repeatedly told Anderson that Bluhm and Carlin were trustworthy.

179.    For all these reasons and others, Anderson placed trust and confidence in Bluhm and Carlin.  As a result, Bluhm and Carlin gained influence and superiority over Anderson.

### Anderson performs, keeping the venture's interests at the forefront of his mind

180.    Since becoming President of Rush Street Productions, Anderson has worked hard and successfully to build and grow the business, working out of Fargo, North Dakota.  Anderson has performed all of his responsibilities under the Agreement.

181.    Rush Street Productions developed and launched a televised poker tour and brand for the Rush Street entities—Poker Night in America.

182.    Rush Street Productions has produced 43 tour events, and around 250 filmed television episodes.  Thirty percent of those tour events were held, and episodes filmed, at brick-and-mortar casinos owned and operated by Rush Street.

183.    Poker Night in America is a successful television show that has been airing on CBS Sports network since June 2014.

184.    Rush Street Productions launched a successful Poker Night in America app that is available from the Apple app store and Google play.

185. Rush Street Productions recently launched a successful over-the-top, internet-based channel for Poker Night in America. Viewers of Poker Night in America can also watch episodes on Amazon's Prime streaming service.

186. Poker Night in America is the #2 poker-related YouTube content in the world. Poker Night in America's YouTube channel gets over 60,000 views each day.

187. Anderson oversaw each of these initiatives by Rush Street Productions and was vital to their success.

188. Anderson has contributed to the successes of Rush Street and Rush Street Interactive through the development of Rush Street Productions. Anderson gave the Rush Street Defendants what they desperately wanted—a popular and successful televised platform to use to market the rest of the Rush Street business units.

189. For example, the Rush Street Defendants benefit from Poker Night in America because the tour and show has helped develop awareness of the Rush Street brands, the Rush Street brick-and-mortar casinos, and the Rush Street Interactive virtual casinos, enriching the Rush Street Defendants through profits and future business interests.

190. These benefits are particularly important to Rush Street Interactive's business, given the unique benefits of using televised poker to develop online gaming customers.

191. According to a document available on the SEC's website, Rush Street Interactive launched its first online gaming casino site, PlaySugarHouse.com, in September 2016, years after Poker Night in America had started hosting tour events and building Rush Street brand awareness.

192. Carlin said in an August 13, 2020 conference call, a transcript of which is available on the SEC's website, that "We [Rush Street Interactive] feel that one of our competitive advantages is that our brand and online casino platform appeal equally to both genders, and as

such, we believe that we're able to target and successfully acquire a broader player demographic than many of our peers."

193.  On that same conference call, Schwartz reiterated the importance of the Rush Street brand awareness to Rush Street Interactive's success:

> We believe one of our strongest competitive advantages is the ability we have developed to quickly and efficiently enter new markets and secure significant market share.  It makes a big difference when you get a head start on a market.  We focus on building brand awareness early and acquiring early adopter players in any given market.  This is a competitive advantage that we think is sustainable.  We have successfully been first to market in Pennsylvania, Indiana and most recently, Illinois.

194.  Schwartz even recently told Anderson about his gratification in hearing people he meets tell him they know about Poker Night in America—both the television show and the brand.

195.  The Rush Street Defendants have also benefitted from the many Poker Night in America tour events held at Rush Street casinos, drawing customers to Rush Street's physical casinos.

196.  Carlin himself attended some of these tour events, hosting dinners with friends and the celebrity Poker Night in America tournament contestants.

197.  The Rush Street Defendants would not have had the benefit of all of Anderson's work with Poker Night in America were it not for the Agreement, including the 1% equity interest they promised Anderson in Rush Street Interactive.

### *The Rush Street Defendants perform under the Agreement*

198.  Except for the 1% equity interest that they now—years later—refuse to honor, the Rush Street Defendants have performed their obligations under the Agreement, as well.

199.  The Rush Street Defendants employed Anderson as the President of Rush Street Productions.

200.    The Rush Street Defendants have paid Anderson his salary of $200,000, until Anderson voluntarily reduced his salary in 2017.  Anderson voluntarily reduced his salary because he believed in the business and because he believed he could, ultimately, count on the 1% equity interest in Rush Street Interactive that he was promised.

201.    The Rush Street Defendants have invested over $1.25 million in Rush Street Productions.

### *Anderson is assured that he does not need to be concerned about the lack of formal documentation memorializing the Agreement*

202.    When the Rush Street Defendants continued to fail to put together the operating agreements for Rush Street Interactive and Rush Street Productions, or a revised formal letter memorializing the Agreement, Anderson reached out to Schwartz.

203.    Schwartz explained that Anderson did not need to worry about the lack of formal documentation related to the Agreement.

204.    According to Schwartz, everyone at Rush Street and Rush Street Interactive was incredibly busy.  That was supposedly why the Agreement had not yet been further memorialized.

205.    Schwartz told Anderson that even Schwartz's own agreement for his 5% stake was not formally memorialized.

206.    Schwartz told Anderson that the Rush Street Defendants would turn to Anderson's agreement after formalizing Schwartz's.

207.    On more than one occasion, Schwartz assured Anderson that Anderson did not have to be concerned about Anderson's 1% equity interest or the lack of a formal agreement.

208.    Schwartz told Anderson a few additional times over the years that Schwartz had not yet formalized his own agreement with the Rush Street Defendants, and that once his agreement was formalized, they would turn to Anderson's agreement.

209.     Anderson trusted that the Rush Street Defendants would tell Anderson when Schwartz's agreement became memorialized and they were ready to memorialize the Agreement with Anderson.

## The Rush Street Defendants repeatedly
### fail to document and recognize equity interests

210.     Until recently, Anderson had no reason to think that the Rush Street Defendants would renege on their promise to honor his equity interest in Rush Street Interactive.

211.     But Anderson has now learned that the Rush Street Defendants' conduct is not an isolated incident. It may well be part of a broader pattern of attracting employees with the promise of extending equity but then either failing to memorialize the equity agreement or only doing so later under pressure.

212.     For example, on information and belief, Rush Street, Bluhm, and Carlin had promised Schwartz a 5% equity interest in Rush Street Interactive but did not memorialize it for years. Schwartz, too, had relied upon Rush Street's promise of equity in his decision to join and build Rush Street Interactive.

213.     On information and belief, and unbeknownst to Anderson at the time, in 2016, Schwartz became concerned about the Rush Street Defendants' intentions to honor his equity interest.

214.     This led Schwartz to threaten leaving Rush Street Interactive. On information and belief, it was only after Rush Street, Bluhm, and Carlin faced the specter of Schwartz's departure from Rush Street Interactive that they finally documented his equity interest.

215.     Anderson has recently learned that Rush Street, Bluhm, and Carlin had also promised another individual an equity stake in Rush Street Interactive but failed to document it. On information and belief, Rush Street, Bluhm, and Carlin never honored that promise. Instead, on information and belief, when that individual left Rush Street, Rush Street, Bluhm, and Carlin

used that lack of documentation memorializing their promise to insist on a negotiated resolution for an amount far less than the value of the equity that they had promised.

216.    Anderson was not aware of either incident or Rush Street, Bluhm, and Carlin's pattern of such conduct until recently.

### *The Rush Street Defendants fraudulently conceal their failure to recognize Anderson's equity interest in Rush Street Interactive*

217.    As far as Anderson knew at the time, the Rush Street Defendants never prepared an executed operating agreement for either Rush Street Interactive LLC or Rush Street Productions.

218.    Further, neither the Rush Street Defendants nor Schwartz told Anderson that Rush Street and Schwartz had formalized their agreement.

219.    In light of Anderson's trust and confidence in the Rush Street Defendants, and Anderson and the Rush Street Defendants' relationship as joint venturers and co-equity holders, Anderson believed that the Rush Street Defendants would notify him if some further action was necessary to reflect his equity interest or when the Rush Street Defendants had prepared operating agreements reflecting Anderson's equity interest.

220.    Without informing Anderson, however, on or around January 1, 2019, more than four years after inducing Anderson to join the Rush Street Defendants and become the President of Rush Street Productions, on information and belief, the Rush Street Defendants converted Rush Street Interactive LLC into a limited partnership.  Unbeknownst to Anderson at the time, the Rush Street Defendants also established an operating agreement for only Rush Street Interactive, LP, the converted entity.

221.    On information and belief, at the time of the conversion, the Rush Street Defendants entered into a "Contribution Agreement," under which all of the issued and outstanding equity interests of Rush Street Interactive LLC purportedly were transferred to Rush Street Interactive, LP.

222. At the time of the purported conversion, the Rush Street Defendants did not provide Anderson with notice of the Contribution Agreement or the conversion.

223. At the time of the purported conversion, the Rush Street Defendants did not provide Anderson with a copy of the Rush Street Interactive, LP operating agreement.

224. Although Anderson was not aware of it at the time, the Rush Street Defendants appear not to have documented Anderson's 1%-equity position in Rush Street Interactive LLC in the documents effecting the conversion to Rush Street Interactive, LP, and apparently did not transfer Anderson's 1%-equity position to Rush Street Interactive, LP.

225. Among other things, and although Anderson was not aware of it at the time, the Rush Street Defendants do not appear to have memorialized Anderson's 1% equity interest in Rush Street Interactive, LP's operating agreement.

226. Anderson only received a copy of Rush Street Interactive, LP's operating agreement in late December 2019, when he invested in a new Rush Street-related entity, RSI Investors, LLC, which is a holding company.

227. Carlin had invited Anderson to invest in RSI Investors, LLC, even offering to loan Anderson the money to do so.

228. The Rush Street Interactive, LP operating agreement was an exhibit to the voluminous RSI Investors, LLC unit subscription agreement.

### The Rush Street Defendants wrongfully fail to recognize Anderson's equity interest in the converted Rush Street Interactive, LP

229. The Rush Street Defendants' failure to account for Anderson's 1% equity interest in Rush Street Interactive LLC when converting the entity to Rush Street Interactive, LP was wrongful conduct and done in bad faith.

230. The equity of Rush Street Interactive, LP is identifiable property traceable to the Rush Street Defendants' wrongful conduct and bad faith.

231.    Equity in Rush Street Interactive, LP is specific property of which the Rush Street Defendants' actions deprived Anderson.

232.    On information and belief, the Rush Street Defendants possess and control the equity of Rush Street Interactive, LP, including the equity that Anderson should rightfully possess, own, and control.

233.    But because Anderson was unaware of the Rush Street Defendants' failure to honor his 1% equity interest in Rush Street Interactive LLC when converting the entity to Rush Street Interactive, LP, he continued to work with and for the Rush Street Defendants.

### Anderson learns of the Rush Street Defendants' intention not to honor the Agreement

234.    Recently, the Rush Street Defendants announced that Rush Street Interactive will soon go public through a Special Purpose Acquisition Company at a valuation of $1.78 billion.

235.    According to a document related to the acquisition available on the SEC's website, Rush Street Interactive today "is a market leader in online casino and sports betting in the United States."

236.    Even more recently, on August 4, 2020, Anderson learned that the Rush Street Defendants do not recognize and do not intend to honor his 1% ownership stake in Rush Street Interactive.

237.    On June 11, 2020, based on Rush Street Interactive's anticipated public offering, Anderson sent Carlin an email regarding their agreement that Anderson would have a 1% equity interest in Rush Street Interactive.

238.    Carlin did not respond to Anderson's June 11, 2020 email.

239.    Unbeknownst to Anderson, during this same period the Rush Street Defendants were working on assorted documents related to Rush Street Interactive's upcoming public offering that included representations about Rush Street Interactive's ownership.

240.    For example, a business combination agreement dated July 27, 2020, and subsequently filed with the SEC, included representations about the ownership of Rush Street Interactive's equity.

241.    These filings inaccurately do not account for Anderson's equity interest in Rush Street Interactive.

242.    The Rush Street Defendants did not notify Anderson of these filings or respond to his inquiries regarding his equity interest before making these filings.

243.    On July 29, 2020, having heard no response from Carlin for weeks, Anderson sent a follow-up email to both Carlin and Schwartz.  Anderson again asked about the status of his 1% equity interest in Rush Street Interactive.

244.    Neither Carlin nor Schwartz responded to Anderson's second email.

245.    On August 2, 2020, having heard no response from Carlin or Schwartz, Anderson sent a further follow-up email to Bluhm, Carlin, and Schwarz.  Anderson wrote:

> As part of the offer – both the term sheet and written contract you sent – I received, among other incentives, a 1% interest in Rush Street Interactive (RSI).   Shortly after I received the contract, Richard contacted me to let me know that he would have a revised, slimmer contract, so I did not need to execute the original contract. That contract was never sent.
>
> For the past eight years, I have abided by the terms of the contract and long-passed the full vesting date of four years for my RSI equity. I even took a 40% pay cut a few years ago to help keep RSP solvent.
>
> Now that RSI is going public, it is important that I get written acknowledgment of my 1% equity interest in the enterprise.  This is clearly a huge event for me and something that I am extremely excited for, having come aboard during the earliest days of both RSP and RSI.

> I have written both Greg [Carlin] and Richard [Schwartz] asking for clarification of my ownership percentage but neither of you has responded to me. Given the upcoming IPO, I need written confirmation within five (5) business days of the date of this letter of my 1% stake. If not, I will pursue any and all avenues to preserve my legal rights.
>
> I have enjoyed my time working with you all and building the business and hope that we can maintain a successful partnership going forward.

246.     Finally, after months of silence, the Rush Street Defendants responded. Two days later, on August 4, 2020, Carlin responded to Anderson's third email, copying Bluhm and Schwartz. Ignoring the Term Sheet, Counteroffer, the Agreement, and the Agreement Letter, as well as Anderson's crucial efforts and contributions to the success of Rush Street and Rush Street Interactive over the last eight years, Carlin made clear that the Rush Street Defendants would not honor Anderson's longstanding and agreed-to 1% equity interest in Rush Street Interactive.

247.     The Rush Street Defendants are willfully, wantonly, and in bad faith failing to honor the Agreement.

## CAUSES OF ACTION

### Count 1
### (Breach of Contract – Against Defendants
### Rush Street Gaming and Rush Street Interactive)

248.     Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

249.     Anderson, Rush Street, and Rush Street Interactive formed a valid and enforceable contract that included Anderson having a 1% ownership stake in Rush Street Interactive.

250.     Anderson performed his end of the Agreement.

251.     Rush Street and Rush Street Interactive have materially breached the Agreement.

252.     As a direct and proximate result of Rush Street and Rush Street Interactive's breaches, Anderson has suffered damages in an amount to be determined at trial.

**Count 2**
**(Breach of Fiduciary Duty – Against Defendants Bluhm and Carlin)**

253.    Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

254.    Bluhm, Carlin, and Anderson were in a fiduciary relationship.

255.    As a result of this fiduciary relationship, Bluhm and Carlin owed Anderson fiduciary duties, including of good faith, loyalty, and confidence.

256.    Bluhm and Carlin breached their fiduciary duties to Anderson.

257.    As a direct and proximate result of Bluhm's and Carlin's breaches of their fiduciary duties, Anderson has suffered damages in an amount to be determined at trial.

**Count 3**
**(Conversion – Against All Defendants)**

258.    Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

259.    Alternatively, if there was not a contract, the Rush Street Defendants have engaged in conversion.

260.    Anderson has a right to a 1% equity interest in Rush Street Interactive.

261.    Anderson has a right to immediately, absolutely, and unconditionally possess a 1% equity interest in Rush Street Interactive.

262.    On June 11, July 29, and August 2, 2020, Anderson demanded possession of his 1% equity interest in Rush Street Interactive.

263.    The Rush Street Defendants have assumed control, dominion, or ownership of Anderson's personal property, namely the 1% equity interest in Rush Street Interactive that is rightfully Anderson's.

264.    The Rush Street Defendants' exercise of control, dominion, or ownership over Anderson's 1% equity interest in Rush Street Interactive is unauthorized and wrongful.

265.    As a direct and proximate result of the Rush Street Defendants' wrongful conduct, Anderson has suffered damages in an amount to be determined at trial.

### Count 4
### (Unjust Enrichment – Against All Defendants)

266.    Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

267.    Alternatively, if there was not a contract, the Rush Street Defendants have been unjustly enriched.

268.    The Rush Street Defendants have unjustly retained benefits to Anderson's detriment.

269.    The Rush Street Defendants' retention of those benefits violates justice, equity, and good conscience.

270.    As a direct and proximate result of the Rush Street Defendants' wrongful conduct, Anderson has suffered damages in an amount to be determined at trial.

### Count 5
### (Promissory Estoppel – Against All Defendants)

271.    Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

272.    Alternatively, if there was not a contract, the Rush Street Defendants are bound to the Agreement by promissory estoppel.

273.    The Rush Street Defendants made a clear and definite promise to Anderson that he would receive a 1% equity stake in Rush Street Interactive.

274.     The Rush Street Defendants reasonably expected that Anderson would rely on the 1%-equity promise, and Anderson did rely on that promise, to his detriment.

275.     The Rush Street Defendants' 1%-equity promise must be enforced to prevent injustice.

276.     As a direct and proximate result of the Rush Street Defendants' wrongful conduct, Anderson has suffered damages in an amount to be determined at trial.

### Count 6
### (Constructive Fraud – Against All Defendants)

277.     Anderson realleges, as if fully set forth herein, all allegations in paragraphs 1-247 above.

278.     The Rush Street Defendants breached legal and equitable duties that they owed Anderson as a result of their fiduciary and/or confidential relationship.

279.     The Rush Street Defendants' breaches of their legal and equitable duties had a tendency to and did deceive Anderson.

280.     The Rush Street Defendants have profited from their breaches.

281.     The Rush Street Defendants knew of their breaches and accepted the fruits of their constructive fraud.

282.     As a direct and proximate result of the Rush Street Defendants' constructive fraud, Anderson has suffered damages in an amount to be determined at trial.

### JURY TRIAL DEMANDED

Anderson demands a jury trial as to all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Anderson demands judgment as follows:

1.     Finding in Anderson's favor, and against the Rush Street Defendants, on all claims.

2.     Awarding Anderson the full measure of damages permitted by law.

3.      Ordering the Rush Street Defendants to enforce the contract and recognize Anderson's 1% equity interest in Rush Street Interactive.

4.      Imposing a constructive trust for Anderson's benefit on the equity of Rush Street Interactive.

5.      Awarding Anderson punitive damages.

6.      Awarding Anderson such other and further legal and equitable relief as the Court may deem appropriate.


Date:  September 15, 2020.                    /s/ Suyash Agrawal
                                              Suyash Agrawal
                                              MASSEY & GAIL LLP
                                              50 E. Washington Street, Suite 400
                                              Chicago, IL  60602
                                              (312) 283-1590
                                              sagrawal@masseygail.com

                                              Robert J. Gilbertson
                                              Matthew D. Forsgren
                                              Caitlinrose H. Fisher
                                              Virginia R. McCalmont
                                              GREENE ESPEL PLLP
                                              208 South LaSalle Street, Suite 814
                                              Chicago, IL  60604
                                              222 South Ninth Street, Suite 2200
                                              Minneapolis, MN  55402
                                              (612) 373-0830
                                              MForsgren@GreeneEspel.com
                                              BGilbertson@GreeneEspel.com
                                              CFisher@GreeneEspel.com
                                              VMcCalmont@GreeneEspel.com

                                              *Attorneys for Plaintiff Todd L. Anderson*